PEABODY *vs.* FENTON and others.

Where a person obtained the assignment of a bond and mortgage, from the owner thereof, by false pretences, amounting not only to a gross fraud but also to a felony; and transferred the same to a third person for less than their value, and under circumstances calculated to put the latter upon inquiry; *Held* that no title passed to the purchaser, under the assignment to him; and that the owner of the bond and mortgage was entitled to a decree declaring the assignments fraudulent and void, as against him, and directing the purchaser to re-assign the bond and mortgage; and to refund the amount which such purchaser had collected upon the same, with interest.

Where the purchaser of a bond and mortgage, obtained from the owner thereof by fraud and felony—though he has no reason to suspect any fraud in the transaction, so as to be put upon inquiry—pays for such securities less than the amount actually due thereon, if he is entitled to protection as a bona fide purchaser without notice, he will not, in equity, be permitted to retain the bond and mortgage for the full amount due thereon; but only for the amount which he paid for them.

*Andrews* v. *Dieterich*, (14 *Wend. Rep.* 36,) doubted. *Mowry* v. *Walsh*, (8 *Cowen*, 238,) and *Parker* v. *Patrick*, (5 *Term Rep.* 175,) commented upon.

Even in the case of negotiable paper which has been lost by the owner, or which has been obtained from him by fraud, or by larceny, the holder thereof cannot retain it as against the rightful owner, where he received it under circumstances which were calculated to throw a suspicion upon the right of the person from whom he received it, to dispose of it as his own. For purchasing a security under such circumstances is gross negligence.

Thus where persons purchased a bond and mortgage originally given to secure the payment of $8000, and upon which the sum of $2000 and the annual interest had been paid; they paying therefor only three-fourths of their actual value, in unsaleable goods at forty per cent above their market price, and out of the usual course of business; *Held* that the fact that the pretended owner of the securities was willing to make such a sacrifice, and for articles which he did not intend to use himself, but which were to be immediately sent to an auctioneer to be sold, was sufficient to put the purchaser upon inquiry as to the ownership of the bond and mortgage.

A party, to be protected as a bona fide purchaser without notice, must have acquired the legal title, as well as an equitable right, to the property.

THIS case came before the chancellor upon appeal, by W. and R. Kelly and Downer and Rogers, four of the defendants, from a decree of the vice chancellor of the eighth circuit. In November, 1837, J. J. McPherson mortgaged to D. McPherson certain lands in Genesee county, to secure the payment of $8000; for which he also gave his bond, payable in eight yearly

payments, commencing on the first of April then next, with annual interest. The first payment, with interest on the whole bond and mortgage, was paid in April, 1838; and in May of the same year the mortgagee assigned the bond and mortgage, and the payments thereafter to become due thereon, to the complainant. In March, 1839, the complainant being desirous of raising the money upon the bond and mortgage, applied to the defendant J. J. Fenton, then a broker of Rochester, to buy the same. Fenton, for the purpose of defrauding the complainant, falsely represented to him that he was the agent of John F. Wyckoff of the city of New-York, for the purpose of investing money for him on bonds and mortgages, and that if the com-plainant would make an assignment of his bond and mortgage to Wyckoff, and leave the same to be forwarded to the latter, the money would be paid as soon as the necessary searches could be made to ascertain the validity of the title and the sufficiency of the security. The complainant accordingly executed an assignment to Wyckoff, and left it with Fenton to be delivered upon the receipt of the money, after the proper searches should have been made. After waiting some time the complainant called upon Fenton for the money, but was put off by him, with various excuses, from time to time, and in the meantime the complainant had received the second payment upon the bond and mortgage, leaving the amount then due, from the mortgagor, $6000, and interest from the first of April, 1839. Shortly afterwards Fenton made an agreement, in the name of J. F. Wyckoff, who was an infant and with little or no property, and who had never authorized Fenton to act as his agent in the purchase of bonds and mortgages, to sell the complainant's bond and mortgage to the defendants Downer & Rogers; one-fourth thereof to be paid in cash, and the residue in French fancy goods, at specified prices which were much beyond the real value of the goods. And Wyckoff, who was ignorant of the fraud which Fenton had practised upon the complainant, in his name, and supposing that Fenton had taken the assignment in his name for some honest purpose, consented to execute an assignment of such bond and mortgage upon the sale

Peabody *v.* Fenton.

which Fenton had made to Downer & Rogers.   But as Downer & Rogers were indebted to the defendants W. & R. Kelly, it was arranged that the assignment should be made directly to them.   Wyckoff accordingly executed an assignment of the bond and mortgage to W. & R. Kelly, on the 7th of June, 1839; and Fenton received the money and goods from Downer & Rogers, according to the agreement.   He sent the goods to an auctioneer to be sold, and received an advance thereon to their full value.

The complainant being ignorant of the fraud that had been practised upon him, and of the sale of the bond and mortgage, again applied to Fenton for the money, on the 5th of July, 1839.   At that time Fenton, in connection with some other persons, had organized a fraudulent association under the general banking law, called The Farmers' Bank of Seneca County. And when the complainant applied for his money, Fenton again put him off with some excuse; but remarked that the complainant might have heard unfavorable reports of him, but that he was willing to give him security until the money could be procured from Wyckoff for the bond and mortgage.   He accordingly filled up and delivered to him for that purpose a certificate for 600 shares of $100 each, in The Farmers' Bank of Seneca County, which subsequently turned out to be worthless. And he shortly afterwards gave to him two or three drafts and certificates of deposit of the same banking association, which also were worthless, and were never paid.   In April, 1840, the complainant heard, for the first time, of the assignment of the bond and mortgage to W. & R. Kelly, and that their attorney had received from the mortgagor $1320 of the payment of principal and interest which became due upon the first of that month.   He thereupon filed his bill in this cause, against the assignees and against Fenton and J. F. Wyckoff, and also against The Farmers' Bank of Seneca County, and John Wyckoff, who was the president thereof. He afterwards ascertained that Downer & Rogers had procured the assignment of the bond and mortgage to the Kellys, under the purchase made by the former from Fenton through the medium of a

broker employed by him to negotiate the sale thereof; and he thereupon amended his bill, by stating that fact and making Downer & Rogers also defendants in the suit. The cause was heard before the vice chancellor upon pleadings and proofs as to W. & R. Kelly and Downer & Rogers, and upon the bill taken as confessed as to the other defendants. He decided and decreed that the assignment from the complainant to J. F. Wyckoff, and the assignment of the latter to the Kellys, were fraudulent and void as against the complainant. The decree also directed W. & R. Kelly to reassign the bond and mortgage to the complainant, and to refund to him the amount they had collected upon the bond and mortgage, with the interest thereon; that the complainant should transfer to them his interest in the certificate of stock, and in the drafts and certificates of deposit of the Farmers' Bank of Seneca County, given to him by Fenton.

*G. H. Mumford*, for the appellants. The defence rests substantially upon two points. 1. A question of fact, whether we have made out that the defendants are bona fide purchasers without notice; and 2. A question of law, whether as bona fide purchasers the defendants' equity is superior to the complainant's. We suppose that the Kellys stand precisely in the situation of Downer & Rogers, and that if the latter were bona fide purchasers, the former must occupy the same position. Were Downer & Rogers, then, bona fide purchasers? The answers of the defendants fully deny all notice or suspicion of the fraud charged in the bill; but their answer on oath having been waived, this furnishes no testimony. It however puts the fact of their want of notice distinctly in issue, and throws the burden of proof upon the complainant. (2 *Edw. Rep.* 259. *Hop. Rep.* 48. 8 *Cowen,* 361.) The complainant has introduced no direct testimony on this subject, showing notice to the defendants; but the fact of such notice is disproved, so far as such a fact can be disproved. *John F. Wyckoff*, a witness for the complainant, testifies that he does not know the Kellys, and that he had no acquaintance with Downer & Rogers previous

to negotiating this bond and mortgage. He had no conversation with Downer & Rogers about this sale, previous to the assignment, and never heard any thing from them indicating a knowledge of the purposes for which Fenton held the bond and mortgage. *Nathaniel S. Jacob*, a witness for the complainant, went to Downer & Rogers' store to look at the goods, for which the bond and mortgage were in part sold. Saw Downer, but had no conversation with him, nor did Fenton or Wyckoff at that time. *Henry P. Hoyt*, a witness for the defendants, was employed by Fenton and Wyckoff to negotiate the bond and mortgage. Witness was but slightly acquainted with Downer & Rogers, having had but one previous transaction with them. He took Fenton and Wyckoff to Downer & Rogers and introduced them. They were previously strangers.

There is then no direct testimony to throw a shade of suspicion over the denial of the defendants in their answer, of all notice of fraud. When there exists only a suspicion of notice, equity will not act upon it. (*Eyre* v. *Dolphin*, 2 *Ball & Beat.* 290.) The only possible ground upon which the complainant's counsel can urge a constructive notice to the defendants arises from the fact that the goods which formed part of the consideration for the bond and mortgage, were sold by Downer & Rogers at prices much higher than the goods were then worth. Downer & Rogers were merchants, had failed, and were left with a stock of goods on hand, which they were anxious to dispose of and close up their concern. Their object was not to invest money, but to sell their goods at a fair price and pay their creditors. The only object they could have had in advancing money was to get a good price for their goods. At this time it was difficult to negotiate country mortgages for cash upon any terms. This was undoubtedly known to them. Securities the most unimpeachable, if disposed of at all in market, must be sold at a sacrifice; and while transactions of this kind were going on around them daily, it could arouse no suspicion that in this case the holders of a bond and mortgage, having six years to run, should desire to realize the avails at a discount. That the goods were worth less than Wyckoff allowed for them

may be admitted ; but the proof to show that the difference was so great as to attract particular notice or attention is far from satisfactory. *Jacobs*, it is true, estimates the goods as being worth 40 per cent less than invoice prices. This, taking the money into consideration, would be an average discount on the whole amount of about 30 per cent ; a large discount, certainly, but hardly sufficient to carry home to a purchaser any reasonable presumption that the vendor's title was defective. But Jacobs is the confidential agent and friend of Fenton & Wyckoff. He examined the goods and saw the invoice. He told Fenton that he did not think the goods worth the prices charged, but he did not then inform him what deduction should be made, and his notions are very likely to be colored by the subsequent auction sale. Again, the goods were fancy summer goods, and subject to great depreciation, more so than other kinds of goods ; and during the years 1839 and 1840, when in auctioneer's hands, depreciated 40 or 50 per cent. More than one quarter of the goods was millinery, which depreciates more than any other goods in market, and is rarely sold at auction. This portion of the goods was charged in invoice at 95 cts. per yard, and Downer sold a similar case at $1,25 to $1,38. The auctioneer estimated the goods at auction prices, at $3000 ; still presuming they might bring far beyond that sum. He wished to be on the safe side. The auction prices are no fair test of the fair value of goods, particularly summer fancy goods, and put upon the market, as a large portion of these were, out of season and when there was no demand for them. But the conduct of Downer & Rogers negatives the idea that they had any suspicion in point of fact of any difficulty in reference to the title of Wyckoff. Certificates as to title and value were produced with the assignment, but Downer & Rogers would not close the matter in this way. They required and obtained the admission of the mortgagor that all was right, and delayed closing the transaction until this was done. Several weeks passed away in the investigation of the matter, and it was not until all was done that prudent men would do, that Downer & Rogers delivered the goods and completed the bargain. Assuming that the terms of sale were not

of a character to stamp the title of Wyckoff with marks of suspicion, in the estimation of men of ordinary prudence, it cannot be objected here that a full consideration was not paid. If the mortgage was valid in Wyckoff's hands, he had a right to sell, and Downer & Rogers to buy, at any price they could agree upon. No authority is needed for this position.

As bona fide purchasers the defendants acquired a perfect title, subject only to the equities of the mortgagor, if any. The doctrine that a bona fide purchaser of chattels, from a fraudulent vendor, acquires a good title as against the original owner, seems to be well settled in this country and in England. So with respect to negotiable notes, money, checks, &c. even when the owner has not voluntarily parted with title or possession. (12 *John.* 348. 8 *Cowen*, 238. 13 *Wend.* 570. 20 *Idem*, 267. 22 *Idem*, 318. 1 *Hill*, 302.) The purchaser of a bond and mortgage stands upon a little different footing. It would seem that a bona fide purchaser of such a security would obtain a perfect title as against all the world except the original obligor or mortgagor ; but as to them he takes subject to their equities. The reason is, that the assignee or purchaser can go to the debtor and ascertain the facts, but he is not obliged to, nor can he ascertain what claim others may have. (2 *John. Ch.* 441, *and cases there cited.* 1 *Munf.* 533. 2 *John. Ch.* 479. *Livingston* v. *Dean*, 1 *Id.* 566, 581. *Murray* v. *Ballou, Idem*, 213.) The same ground is taken by Woodworth and Sutherland, justices, in the court of errors, in the case of *James* v. *Morey*, (2 *Cowen*, 288, 297.) In *Van Rensselaer* v. *Stafford*, (*Hopk.* 575,) Stafford received his assignment to secure a precedent debt.

But it is said, by the vice chancellor, that although the defendants, as bona fide purchasers from a fraudulent vendee, might be permitted to hold the securities, yet inasmuch as their title is derived through a felony, the plaintiff must prevail. The argument is this: The securities were obtained by Fenton by false pretences. This offence may be punished by imprisonment in the state prison. (2 *R. S.* 677, § 53.) Felony is an offence so punishable; (2 *Id.* 702, § 30 ;) consequently this is a felony, and the common law rule applies that no title can be

acquired through a felony. (*Andrews* v. *Dieterich*, 14 *Wend.* 31.) It is not pretended that the obtaining of goods or property upon false pretences is a felony at common law. (*Morey* v. *Walsh*, 8 *Cowen*, 238.) The statute, it is said, works the change. If it did, it could only have been by a technical and forced construction, that the consequences claimed would have flowed from it; and the argument may be met by one equally literal and technical. We say then that the statute does not in terms declare this a felony. The statute (2 *R. S.* 677, § 53) subjects the offender to imprisonment in a state prison, but does not declare the offence a felony. And it (2 *R. S.* 702, § 30) defines the meaning of the word *felony* only when used *in that act* or *any other statute.* It leaves then all offences, except such as are declared by statute to be felonies, as they were at common law, and this amongst others. But there is another rule that comes to our aid here. An offence shall never be made felony by construction of doubtful or ambiguous words of a statute. (*Barb. Cr. Law*, 18.) Therefore, if it be prohibited under *pain of forfeiting all that a man has,* (a forfeiture of lands and goods being the criterion of a felony at common law,) or of forfeiting body and goods, &c. it shall not amount to a felony. All penal statutes must be strictly construed.

Admitting, however, that the legislature by fair interpretation intended to baptize this offence a felony ; there is no reason to believe that they contemplated, by that act, any change in the civil rights of the citizen, not cognizant of or tainted with the offence. It is obvious from the revisers' notes on the section of the revised statutes referred to, (3 *R. S.* 836, § 30,) that no such idea entered into their minds ; but that the object was simply to give a definite meaning to a word used in the statutes, and which without this section had become vague and indefinite. It would be highly improbable, therefore, that the legislature should have intended to go beyond the letter of the law, and have changed the law by implication and inference. And without the very respectable opinion of C. J. Savage, in *Andrews* v. *Dieterich*, (14 *Wend.* 31,) would seem to require but little argument. It has been held repeatedly by the supreme

Peabody *v.* Fenton.

court, that when the law is settled, a change in the phraseology of the statutes shall not work a change in the law, unless the intention to work such change clearly appears. (2 *Cain. Cas. Er.* 143, 151. 4 *John.* 317, 359. 21 *Wend.* 316, 319. 2 *Hill,* 380.) Here an entire revolution in civil rights is to be effected, by a change in the statute, which would not probably have been suggested to the mind of a single member of either house of the legislature, had the whole 160 members been lawyers. Here a penalty is sought to be imposed upon the defendants, which cannot be done by implication. (*Jones* v. *Estis,* 2 *T. R.* 379. *Myers* v. *Foster,* 6 *Conn. Rep.* 567.) Chief Justice Savage, in *Andrews* v. *Dieterich,* seems to think there is no reason for the distinction between a felony and a fraud, in this respect. But it seems to us that the distinction is obvious and supported by sound reasoning. A party losing his property without his consent, is in no way answerable for the fraud committed upon a bona fide purchaser. If he parts with his property voluntarily, although deceived, he has by his own imprudence enabled the fraudulent vendee to cheat the subsequent purchaser, and should therefore sustain the loss. (2 *Paige,* 169, 172.)

In this case there were acts, on the part of the complainant, previous to the transfer to the defendants, calculated to give currency to the securities, and to induce purchasers to buy, which should preclude him from contesting the rights of a bona fide purchaser, and which would cut off the rights even of the original debtor. I allude now not only to his delivering possession of the bond, mortgage and assignments, but also furnishing Fenton with searches, evidence of title, certificates of value, affidavits as to incumbrances, &c. ; in short, arming him with all the implements to show a perfect title in himself, and to deceive and defraud others. In the case of *Kemp's Ex'rs* v. *McPherson,* (7 *Har. & John.* 320,) a purchaser of land subject to legacies, who gave his bonds for the purchase money, which were assigned and judgments recovered thereon, was denied relief; on the ground that he knew of the charge when he gave the bonds, and ushered them into the world without any intimation on their face that they were subject to charge. So also

at law, a party shall be concluded by admissions, or conduct, upon which others have been induced to act, where, if he were permitted to prove such admissions or conduct false, it would operate as an injury to the persons misled by them. (1 *Cowen & Hill's Notes to Phil. Ev.* 199.)

Again; the complainant, by his own acts, after the transfer of the bond and mortgage to the defendants, relinquished any claim he might have otherwise had thereto, and ratified the sale to them. In order to charge the complainant with having ratified the sale to the defendants, it must appear that he had actual or constructive notice of it. We suppose this appears with sufficient certainty. The assignment of the bond and mortgage from Wyckoff to the Kellys was dated June 7, 1839, and was recorded in Genesee county July 29, 1839, and in Monroe county October 7, 1839. We claim that the record is notice to Peabody, the statute only excepting the case of the mortgagor making payment to the mortgagee without notice. (1 *R. S.* 756.) The facts disclosed in the bill and proofs are abundantly sufficient to put the complainant on inquiry; and this, in equity, is equivalent to actual notice. 1 *Paige*, 461. 4 *Cowen*, 717. 7 *Conn. Rep.* 324.) The following were acts of ratification: On the 5th of July, 1839, the complainant accepted and received from Fenton a certificate of sixty shares of stock in the Farmers' Bank, as security for his money. On the 28th of August he went to Romulus to obtain money; saw Fenton and demanded, not his bond and mortgage, but his money. On that occasion Fenton proposed to give him a draft for $1500; he took the draft, which was at sixty days and without previous acceptance. On the 23d of October the complainant again applied to Fenton for his money. Fenton made various excuses, and offered him a draft and certificate of deposit for $440, payable in four months, and a draft on New-York for $1169,20 at sixty days. On the 30th of December, in the same year, he again went to see Fenton at Romulus, and informed him that the drafts had been protested. He makes no demand of his bond and mortgage, but is attempting to secure something on account of it. Fenton promises him the money in

twenty days. The complainant subsequently made several journeys to Romulus to obtain his money, but was delayed under various pretences until April, 1840. The complainant presented his drafts and certificate of deposit, which became due from October to February, and took all legal measures to charge the parties. If the complainant is chargeable with notice, then slight proof of acquiescence on his part will be sufficient to conclude him. (*Story on Agency,* 247, *et seq.* 2 *Salk.* 442. *Smith* v. *Calsgan,* 2 *T. R.* 188, *note. Cornwall* v. *Wilson,* 1 *Ves.* 509. *Codwise* v. *Hacker,* 1 *Caines,* 526. *Towle* v. *Stevenson,* 1 *John. Cas.* 110. *Armstrong* v. *Gilchrist,* 2 *Id.* 424. 12 *John. Rep.* 300. 2 *Mass. Rep.* 106. 13 *Id.* 361.) In *Trowbridge* v. *Beach,* in the supreme court (not reported) the defendant's acceptance had been fraudulently put in circulation by Hudson. The defendants learning the fact, applied to Hudson for security and obtained partial security. They were held to be concluded, in the action upon the bill, brought by the plaintiff, who had received it from Hudson and without paying value at the time.

*M. F. Delano,* for the respondents. The assignment of the bond and mortgage executed by the complainant to John F. Wyckoff, was procured by the false pretences of Fenton. And the title of Downer & Rogers to the Kellys, being acquired by the commission of a felony, was null and void, even if the persons last named had acquired the securities in good faith and for a full consideration. The delivery of the assignment of the bond and mortgage by the complainant was not absolute, but for a special purpose; and that delivery being procured by representations, which if not felonious were grossly fraudulent, the holders of such securities are not entitled to retain them as against the complainant, although they may be bona fide purchasers, without notice. But neither the Kellys nor Downer & Rogers are bona fide purchasers for a full consideration, and without notice, express or implied, of the rights of the complainants. 1st. Because they derive their title, upon the face of the assignment, from the complainant, through Wyckoff, and are

Peabody *v.* Fenton.

to be charged with all the defects of that title ; 2d. Because they did not purchase in the usual course of trade and for a full consideration ; and 3d. Because the circumstances under which the securities were obtained were such as to induce a prudent man to suspect an adverse claim. The decree of the vice chancellor should therefore be affirmed with costs.

THE CHANCELLOR. There can be no doubt, from the evidence in this case, that Fenton obtained the assignment of the bond and mortgage, from the complainant, by false pretences ; amounting not only to a gross fraud but also to a felony, under the provisions of the revised statutes. And the complainant did no act to ratify that transaction after he was aware of the fraud. It also appears from the testimony that Downer & Rogers, even if they had no reason to suspect some unfairness in the transaction, so as to make it their duty to inquire of the assignor whether Wyckoff was the real owner of the bond and mortgage, paid in money and property, at the extent, thirty per cent less than the amount actually due upon the bond and mortgage. If they were entitled to protection, therefore, as bona fide holders and purchasers without notice, they, or those to whom they procured the transfer to be made in payment or security for an antecedent debt, could not in equity be permitted to retain the bond and mortgage for the full amount due thereon ; but only to the extent of the value of the property, &c. which was paid for the same.

The vice chancellor has placed his decision solely upon the ground that the obtaining of the assignment from the complainant, with intent to defraud him, is a felony by the revised statutes. In the case of *Mowry* v. *Walsh*, (8 *Cowen's Rep.* 238,) which was decided before the adoption of the revised statutes, the supreme court held, in conformity with my decision at the circuit, that where the purchase of goods was obtained by false pretences, and by means of a forged recommendation of the character and responsibility of the purchaser, but not feloniously, a subsequent bona fide purchaser of the goods, from the fraudulent vendee, for a full consideration, and without notice

of the fraud, was entitled to hold such goods as against the original owner. That decision was based upon the principle that where one of two innocent persons must necessarily suffer by the wrongful act of a third person, the loss should fall upon the one of t·m who by his own voluntary act or negligence has enabled the wrongdoer to produce the injury. At the time that decision was made, the obtaining of money or goods by false pretences, with intention to defraud the owner, was a criminal offence punishable with imprisonment in the state prison, or in the county gaol, in the discretion of the court. But it was not a felony at the common law; nor had it then been made a felony by statute. A similar decision was made by the court of king's bench in England, in the case of *Parker* v. *Patrick*, (5 *Term Rep.* 175;) where the obtaining of money or goods by false pretences was punishable by transportation, or by fine or imprisonment, in the discretion of the court. But the revised statutes having declared all offences which render the offenders liable to imprisonment in the state prison to be felonies, the supreme court subsequently held that the power of the fraudulent vendee to transfer a valid title to the property, to a bona fide purchaser without notice of the fraud, no longer existed. (*Andrews* v. *Dieterich*, 14 *Wend. Rep.* 36.) I am inclined to doubt whether this is a correct view of the operation of this provision of the revised statutes. For I apprehend that the principle upon which the decisions in *Mowry* v. *Walsh* and *Parker* v. *Patrick* were sustainable, was not the mere fact that the offence which the first vendee of the property had perpetrated, in obtaining it, was not technically a felony; but that the possession of the property and the apparent ownership thereof, by such vendee, was the voluntary act of the original vendor, and that the latter had not lost the possession by theft or robbery. Without expressing any definite opinion upon this question, however, I think the decree appealed from is sustainable upon other grounds.

Even in the case of negotiable paper which has been lost by the owner, or which has been obtained from him by fraud or by larceny, the holder thereof cannot retain it, as against the rightful owner, where he received it under circumstances which were

calculated to throw a suspicion upon the right of the person from whom he received it to dispose of it as his own. Purchasing a security under such circumstances is gross negligence. Here Downer & Rogers purchased a bond and mortgage which from the inquiries made by them, they must have known to be perfectly well secured; and upon which it appeared by the endorsements that $2000, and the annual interest, had been paid as the payments became due; they paying three-fourths of the actual value of these securities in unsaleable goods, at forty per cent above their market value, and out of the usual course of business. The fact that the pretended owner of these securities was willing to make such a sacrifice, and for articles which he did not intend or wish to use himself, but which were immediately to be sent to an auctioneer to be sold, was sufficient to satisfy any reasonable man that the vendor was probably selling what was not his own. Downer & Rogers ought not, therefore, to have made the purchase without inquiring from the original assignor whether Wyckoff was in fact the real and bona fide owner of these securities. Their negligence in not making some inquiry on that subject was at least equal to, if not greater than, the negligence of the complainant in intrusting an assignment of the bond and mortgage to Fenton, as an escrow, to be delivered to Wyckoff the supposed purchaser, when the money should be paid by him. The principle upon which the decision in the case of *Mowry* v. *Walsh* was based, therefore, was inapplicable to the circumstances of this case.

Again; to protect a party as a bona fide purchaser without notice, he must have acquired the legal title as well as an equitable right to the property. That was the case in *Mowry* v. *Walsh* and in *Parker* v. *Patrick*. For in each of those cases the original owner of the property had made an absolute sale thereof, which sale had been consummated by an absolute delivery to the purchaser. And the sale, although voidable by the vendor, at his election, on account of the fraud, was still valid until rescinded by him. It was therefore like the case of a conveyance of land obtained by fraud, which is also voidable at the election of the grantor; and where the fraudulent grantee has the

Peabody *v.* Fenton.

power to transfer a valid title to a bona fide purchaser without notice of the fraud. But if such bona fide purchaser has not obtained the legal title, by an actual and valid conveyance, he cannot protect himself against the prior equity of the original owner to rescind the conveyance to the fraudulent grantee; although such bona fide purchaser has a contract for a conveyance, and has actually paid for the land. ( *Wigge* v. *Wigge*, 1 *Atk. Rep.* 384; 1 *West's Rep.* 680, *S. C. More* v. *Mayhew, Freem. Ch. Rep.* 175. *Tourville* v. *Nash*, 3 *Peer Wms.* 307.)

In the case under consideration there never was an absolute and unconditional delivery of the assignment to Fenton, as the professed agent of Wyckoff. But it was put into his hands to be delivered upon the actual payment of the purchase money. Wyckoff, therefore, never was the legal assignee of the bond and mortgage, so as to have a valid title at the election of the complainant. And as Wyckoff was an infant, and never authorized Fenton to act as his agent, there was no agreement on his part to become the purchaser of the bond and mortgage. As an infant, he was also incapable of transferring a valid title to the bond and mortgage to his assignees; especially as he, never in fact obtained any part of the consideration which Fenton received upon the sale to Downer & Rogers. Even if the legal title to a mere chose in action was capable of being transferred by assignment, therefore, these supposed transfers were insufficient for that purpose.

The legal title as well as the prior equitable right to this bond and mortgage being in the complainant, he was entitled to the relief granted by the vice chancellor. The decree appealed from must therefore be affirmed, with costs.